UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

HEIDI RADOSEVICH,

                Plaintiff,

       v.                                   Case No. 16-C-1119

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.

## DECISION AND ORDER AFFIRMING COMMISSIONER'S DECISION

Plaintiff Heidi Radosevich filed this action for judicial review of the decision of the Commissioner of Social Security denying her disability insurance benefits under Title II of the Social Security Act. She claims that the decision is not supported by substantial evidence and violates several of the Commissioner's own rules and regulations. For the reasons given below, the decision of the Commissioner will be affirmed.

## BACKGROUND

Plaintiff lives with her husband and two children in Green Bay, Wisconsin. R. 61. On October 17, 2012, Plaintiff, age 46 at the time, completed an application for disability and disability insurance benefits with her alleged disability beginning January 9, 2007. She listed low back injury, fibromyalgia, depression, anxiety, attention deficit disorder (ADD), insomnia, and migraines as the conditions that limited her ability to work. R. 209. Plaintiff previously worked at United Healthcare as a sales and service representative. R. 62. The company terminated her employment on July 22, 2009 because she was unable to work full-time. *Id.* Plaintiff ultimately amended her alleged onset

date to July 22, 2009. R. 304. The Social Security Administration (SSA) denied Plaintiff's application for benefits on April 23, 2013. After her application and request for reconsideration were denied, Plaintiff requested an administrative hearing. ALJ Barry Robinson held a hearing on November 17, 2014. R. 33. Both Plaintiff, who was represented by counsel, and a vocational expert (VE) testified at the hearing. R. 56–88.

In an 18-page decision dated January 26, 2015, the ALJ determined Plaintiff was not disabled. R. 33–50. The ALJ's decision followed the SSA's five-step sequential process for determining disability. At the first step, the ALJ concluded Plaintiff met the insured status requirements and had not engaged in substantial gainful activity since July 22, 2009, the amended alleged onset date. R. 37. At step two of the disability analysis, the ALJ found Plaintiff had the following severe impairments: fibromyalgia; degenerative disc disease of both the cervical and lumbar spine; and mental impairments diagnosed as depression, anxiety, and ADD. *Id.* Although the ALJ found that her migraines were nonsevere, he considered this condition in his assessment. R. 38.

At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal any listed impairments under 20 C.F.R. § 404, Subpart P, Appendix 1. *Id.* The ALJ found that Plaintiff's degenerative disc disease did not meet the requirements of listing 1.04 because the record did not contain evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in an ability to ambulate effectively. *Id.* He concluded that Plaintiff's fibromyalgia did not meet or equal any of the Listed Impairments contained in Appendix 1, Subpart P, Regulations No. 4. R. 39. He further found that Plaintiff's headaches did not meet the level of severity required by any listing in Section 11.00 of the Neurological System. On the question of mental impairments, the ALJ also concluded Plaintiff had moderate restrictions in activities of daily living as well as moderate

2

difficulties in concentration, persistence, or pace but found that her mental impairments were not so severe as to meet or medically equal the criteria of listings in 12.04 and 12.06. *Id.*

The ALJ determined Plaintiff had the following residual functional capacity (RFC): "the claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant can perform simple, routine, and repetitive tasks, performed in a work environment involving only simple, work related decisions, and with few, if any, work place changes." R. 40–41. The ALJ found at step four that Plaintiff was unable to perform any past relevant work. R. 47. Nevertheless, he determined that based on her age, education, work experience, and the RFC that there were a significant number of jobs existing in the national economy that Plaintiff could perform. R. 48. Accordingly, the ALJ concluded Plaintiff was not disabled. R. 50.

## LEGAL STANDARD

The statute authorizing judicial review of decisions of the Commissioner of Social Security states that the findings of the Commissioner as to any fact, "if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "such relevant evidence as a reasonable mind could accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek*, 662 F.3d at 811. The ALJ must provide a "logical bridge" between the evidence and his conclusion. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Asrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

Plaintiff asserts that the ALJ committed seven errors requiring reversal: (1) the ALJ failed to properly evaluate the opinions of her treating physician; (2) the ALJ failed to adopt the limitations provided by the consultative psychological examiner; (3) the ALJ failed to properly evaluate and weigh Plaintiff's statements about the limiting effects of her symptoms; (4) the ALJ failed to properly assess the statements of her friends and family members; (5) the ALJ failed to properly evaluate the opinions of the state agency physicians; (6) the ALJ did not fully inform the vocational expert about Plaintiff's limitations; and (7) the ALJ did not rely on a fully-informed VE and substantially supported RFC in making his determination. I will address each claim of error, but because Plaintiff's claim rests primarily upon her own statements, I will begin there.

**A. Evaluation of Plaintiff's Statements**

Plaintiff claimed she was disabled due to a variety of impairments, including low back injury, fibromyalgia, depression, anxiety, attention deficit disorder, insomnia, and migraines. R. 41 (citing R. 209). Until July 22, 2009, she worked as a Sales and Service Representative for Medicare

4

Supplemental Insurance Plans for United Healthcare Insurance Company. R. 62. She was terminated due to performance problems, which she attributes to her impairments, *id.*, although she also believes it was due to her pending claim against the company. R. 208.

As recounted by the ALJ, Plaintiff testified that she can sit for 30 minutes at most before she must lay down or stand for 15 minutes; she can stand for 20 to 30 minutes and walk for ½ of a block to a block. Her husband works outside the home, and she has two high school aged sons who take care of the family pets. Plaintiff testified she has difficulty lifting a gallon of milk and had severe pain, weakness and numbness in her hands such that she cannot open containers. She testified she could not reach above her head due to radiating pain. She suffers from degenerative disc disease in her back into her legs, and muscle spasms in her legs, arms and whole body. She also testified she suffers from frequent falls caused by her fibromyalgia and her legs giving out. She has tried ultrasound, cold laser therapy, chiropractic treatment, and physical therapy, but her whole body pain persists, and the medications she has taken counteract and have caused lethargy and sleepiness. R. 41–42.

As to her mental condition, Plaintiff testified that she suffers from depression, anxiety and attention deficit disorder. She testified that she does not leave her house, and that she has memory problems and difficulty concentrating. She also suffers from panic attacks. R. 43. Plaintiff testified that since she filed her claim, her symptoms have worsened. She suffers from fog, memory loss, muscle weakness, fatigue, foot numbness, irritable bowel syndrome, and more frequent migraine headaches. R. 41. Because of these symptoms, Plaintiff claims she is unable to perform any substantial gainful employment.

The Social Security regulations distinguish between symptoms, signs and laboratory findings. 20 C.F.R. § 404.1529. Symptoms, such as pain, fatigue, shortness of breath, weakness or nervousness, are the claimant's own description of her impairments. *Id.* §§ 404.1529(a)–(b). "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms)." *Id.* § 404.1529(b). Signs are shown by medically acceptable clinical diagnostic techniques. *Id.* Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques such as chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests. *Id.* § 404.1528(c).

The regulations set forth a two-step procedure for evaluating a claimant's statements about the symptoms—her subjective complaints—allegedly caused by her impairments. *See* 20 C.F.R. § 416.1529. The ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." *Id.* § 404.1529(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the claimant's symptoms and determines how they limit the claimant's "capacity of work." *Id.* § 404.1529(c)(1). In evaluating the intensity and persistence of a claimant's symptoms, the ALJ looks to "all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating and nontreating source, or other persons about how your symptoms affect you." *Id.* The ALJ also considers medical opinions. *Id.* The ALJ then determines whether the claimant's statements about the intensity, persistence, and limiting effects of her symptoms are consistent with the objective medical evidence and the other evidence of record. SSR 16-3p.

On judicial review of the ALJ's decision, the court is not to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for that of the Commissioner. *Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Because the ALJ is in the best position to determine the credibility of witnesses, the court reviews that determination deferentially, although its review is less deferential when the credibility determination is based upon objective factors, as opposed to subjective considerations. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Still, the question is not whether the court agrees with the ALJ, or whether the ALJ's analysis eliminates all possibility of error. Given the non-adversary nature of the disability adjudication process, the latter standard could seldom be met. In many cases, especially the relatively small percentage of the total claims that go to hearing, the determination of the claimant's true functional capacity rests primarily on the claimant's description of her symptoms offered either directly through the claimant, or indirectly through the claimant's friends and/or family, or through the health care professionals whose training and professional interest strongly encourage acceptance of their patient's description of her symptoms. Medical evidence, in many cases, reveals only the existence of an impairment; not its limiting effects, and only rarely is evidence from a disinterested third party available. *See, e.g.*, *Krause v. Berryhill*, No. 16-C-226, 2017 WL 3189450 (E.D. Wis. July 27, 2017) (affirming termination of DIB based on OIG investigation for VA showing claimant engaged in activities inconsistent with claimed incapacity). As a result, courts "merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213–14 (7th Cir. 2003)). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong . . . and deserving of reversal." *Id.* at 413–14 (internal quotations and citations omitted).

In this case, Plaintiff first chastises the ALJ for including in his decision boilerplate language that the Seventh Circuit has criticized. The language at issue reads:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

R. 42. Plaintiff claims this sentence is "meaningless" because the phrase "'not entirely credible' yields no clue to what weight the trier of fact gave the testimony." ECF No. 14 at 16 (citing *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012)). Plaintiff also argues that the sentence betrays a fundamental error the ALJ committed by "fabricating the RFC first, and then using that as a scale to weigh the symptoms." *Id.* Citing the Seventh Circuit's decision in *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012), Plaintiff also contends that the sentence "stands the adjudication process on its head, assessing listings, medical equivalence to listings, and giving the finding of residual functional capacity *without first* properly evaluating and weighing the credibility of the claimant's statements about the severity of symptoms, and their limiting effects." *Id.* (emphasis in original).

These are common, one might even say "boilerplate," criticisms that appear in many appeals from decisions denying Social Security disability benefits. Absent more, however, they go merely to the writing style of, or the template used by, the ALJ, as opposed to the soundness of the decision. The notion that the ALJ's credibility determination should be overturned because the phrase "not entirely credible" fails to convey precisely what weight the ALJ gave the claimant's statements extends a metaphor too far. Obviously, statements do not have weight. We speak of the weight given to a witness' testimony as a way of describing how convincing or persuasive it is. The kind

of precision that measuring a material object's weight allows is not possible when talking about the "weight" given a witness' testimony. There is no standard measurement for assigning weight to witness statements or other kinds of evidence. What is required in this context is an explanation of why and in what respects the ALJ did or did not find the claimant's statements credible; not a specific measurement of weight.

Similarly, the fact that the ALJ set forth the claimant's RFC in his decision before he explained why he found the claimant's statements less than fully credible does not require remand. The fact that he placed his RFC determination in his written decision before his detailed discussion of the claimant's credibility does not mean he arrived at the RFC first and then constructed a credibility determination to support it. This, too, is a matter of writing style. Many judges set out their conclusion at the beginning of their opinions and then explain the reasoning process they used to arrive at that result in the body. Others begin with their reasoning process and wait until the end to reveal their conclusion. In either event, the writing is finalized only after the analysis is done and the decision made. As a result, just because the RFC is set out before the explanation is not a reason to conclude that it came first and the explanation was concocted to support it.

Courts do not reverse the Commissioner's decision because a judge does not like the ALJ's writing style. The question on judicial review is whether the ALJ followed the law and whether substantial evidence supports the Commissioner's decision. "[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367–68 (7th Cir. 2013); *see also Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013)

("The use of boilerplate is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony.").

Plaintiff next criticizes the ALJ for placing too much weight on the absence of medical evidence to discount her subjective complaints. She contends that the ALJ "cherry-picked" the medical record, improperly relied upon his own interpretation and medical opinions, and improperly "played doctor." ECF No. 14 at 16–17. She suggests that once the ALJ determined that her medically determinable impairment could produce the symptoms she claimed, it was improper for him to rely on the medical evidence to assess her statements as to the intensity, persistence, and limiting effects of her symptoms. *Id.* at 17. The ALJ's failure to comply with the Commissioner's standards and the standards of this circuit, Plaintiff contends, requires reversal. *Id.*

It is true that the ALJ may not reject a claimant's statements about the intensity and persistence of her pain or other symptoms or about the effect her symptoms have on her ability to work "solely because the available objective evidence does not substantiate [her] statements." 20 C.F.R. § 1529(c)(2); SSR 96-7p, 1996 WL 374186, at *6 (rescinded March 16, 2016); SSR 16-3p, 2016 WL 1119029, at *5 (effective March 16, 2016). But that does not mean the ALJ cannot consider the medical evidence in assessing a claimant's credibility. Objective medical evidence remains "a useful indicator to help make a reasonable conclusion about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work-related activities." SSR 16-3p at *4; 20 C.F.R. § 404.1529(c)(2). The new ruling explains why:

> The intensity, persistence, and limiting effects of many symptoms can be clinically observed and recorded in the medical evidence. Examples such as reduced joint motion, muscle spasm, sensory deficit, and motor disruption illustrate findings that may result from, or be associated with, the symptom of pain. These findings may be consistent with an individual's statements about symptoms and their functional effects. However, when the results of tests are not consistent with other evidence in

10

the record, they may be less supportive of an individual's statements about pain or other symptoms than test results and statements that are consistent with other evidence in the record.

SSR 16-3p at *5. By way of an example, the ruling describes an individual with reduced muscle strength testing who indicates that for the last year pain has limited her standing and walking to no more than a few minutes a day. The ruling explains that such a person "would be expected to have some signs of muscle wasting as a result. If no muscle wasting were present, we might not, depending on the other evidence in the record, find the individual's reduced muscle strength on clinical testing to be consistent with the individual's alleged impairment-related symptoms." *Id.*

In this case, the ALJ's discussion of the medical evidence in relation to Plaintiff's alleged symptoms complied with the Social Security Administration's (SSA's) regulations and rulings on assessing a claimant's credibility. The ALJ noted that although the medical evidence established some degree of degenerative disc disease in her cervical and lumbar spine, MRIs showed only minimal degenerative changes that did not appear significant. R. 42. Notwithstanding Plaintiff's claims of debilitating back pain, a 2011 MRI of her cervical spine showed mild diffuse disc bulges at C3-4 and C4-5 resulting in mild left neuroforaminal stenosis at C3-4 perhaps slightly increased from the prior exam. *Id.* (citing R. 1036). A 2011 MRI of her lumbar spine likewise showed only mild degenerative changes at the L5-S1 articular facet joints and no evidence of significant disk bulge or herniation, central canal compromise or neuroforaminal stenosis. *Id.* (citing R. 1038). She was given injections at L4-5 and L5-S1 in April 2013. *Id.* (citing R. 1214). At exams in 2014, she exhibited negative straight leg raising bilaterally, no bladder or bowel incontinence, but her gait was slow and wide-based. *Id.* (citing R. 1202). She was able to heel and toe, and tandem walk without difficulty. *Id.* (citing R. 1112).

The ALJ likewise found that the limitations attributed to fibromyalgia were unsupported by any medical signs or laboratory findings and rested entirely on Plaintiff's subjective complaints. R. 43. Indeed, the ALJ noted early in his decision that fibromyalgia might not even be properly considered one of Plaintiff's medically determinable impairments since there was no evidence that any doctor had determined by examination that it met the diagnostic criteria of the American College of Rheumatology. R. 38 (citing R. 721–23 and SSR 12-2p, 2012 WL 3104869). Instead, the diagnosis of fibromyalgia was presumed in April 2011 when Plaintiff reported complaints of fatigue, whole body pain, headaches, TMJ, frequent UTIs, and acne, and continued thereafter and simply adopted by other health care providers as part of Plaintiff's history. R. 43. Notwithstanding these concerns over the absence of evidence of the kind of clinical testing normally used to diagnose fibromyalgia, the ALJ gave Plaintiff "the benefit of the doubt" and "in an abundance of caution," found that fibromyalgia was a severe impairment. R. 38. He also noted, however, that "the majority of the claimant's fibromyalgia 'symptoms' are purely subjective complaints." R. 43.

Plaintiff argues that the ALJ violated the Commissioner's standards by concluding, upon cataloging the medical evidence, that she was capable of light exertional work. But the ALJ's analysis did not end with the conclusion that the medical evidence did not seem to support the degree of incapacity claimed. He went on to explain why he found Plaintiff's subjective complaints not credible to the extent she claimed she was incapable of performing any work. In addition to the absence of signs and laboratory findings, the ALJ noted several reasons why he concluded that Plaintiff was exaggerating her symptoms. The ALJ first pointed to the December 2013 functional testing Plaintiff was scheduled to undergo but did not complete. The ALJ viewed the fact that Plaintiff did not complete the evaluation as evidence that she had exaggerated her symptoms and

limitations. R. 43. The ALJ recounted the therapist's observations that Plaintiff "complained of severe pain with all range of motion and strength testing and demonstrated pain behaviors including muscle guarding and crying." *Id.* (citing R. 1198). She also "demonstrated hypersensitivity to all touch and was unable to tolerate hands on manual muscle testing." *Id.* "Due to [Plaintiff's] significant fear, pain focus and physical pain behaviors, and ROM and strength deficits," the physical therapist conducting the test concluded that she was "not safe or appropriate to undergo functional capacity evaluation at this time." *Id.* (citing R. 1199). The ALJ concluded that while Plaintiff had some limitations, "the evidence submitted does not support the severity of symptoms alleged." *Id.* The fact that the ALJ considered the aborted functional capacity evaluation to be part of the evidence "suggesting that [Plaintiff] has exaggerated symptoms," indicates that he did not believe she was truly incapable of cooperating in the evaluation, that instead her "hypersensitivity to all touch" and her alleged inability "to tolerate hands on manual muscle testing" was likely feigned and reflected a successful effort to avoid performing the test rather than an inability to do so. Given the relatively mild physical findings, the inference drawn by the ALJ was not unreasonable.

In contrast and in further support of his credibility assessment, the ALJ cited the functional capacity evaluation Plaintiff had undergone in September 2011, some two years after her alleged disability onset date. R. 46 (citing R. 778–81). The occupational therapist who administered the test over two days concluded that although Plaintiff had decreased overall balance abilities and decreased lower extremity strength for squatting, stair climbing, and ladder climbing, she displayed abilities most consistent with the demands of "LIGHT-MEDIUM work" as defined as work requiring lifting/carrying 30 pounds maximum and 20 pounds maximum overhead. R. 779. Unlike the therapist who attempted to conduct the 2013 evaluation, who did not comment on Plaintiff's

cooperation, the therapist conducting the test in 2011 noted that "client demonstrated cooperative behavior in that she was willing to work to her maximum abilities and fully participated in all test items." R. 778.

The ALJ also noted that Plaintiff failed to comply with treatment recommendations of her health care providers. She continued to smoke despite being advised on numerous occasions to stop because of the impact it might be having on her migraine headaches and fibromyalgia. The ALJ noted that she was also noncompliant in taking prescribed medications. The ALJ specifically referenced her healthcare provider's note in November 2011 that "complicating her issues is the fact that nearly every medication they tried her on either caused problems, or allegedly caused weight gain, or she discontinued it, or she does not use it appropriately." R. 44 (citing R. 1272). The ALJ reasonably concluded that "[t]he claimant's failure to follow her physician's recommendations indicates that her symptoms may not have been as severe as she alleged." R. 45. Given the severity of the symptoms she claimed and the fact that the principal side effect mentioned was weight gain for a woman who weighed roughly 143 pounds, the ALJ's conclusion was not unreasonable. R. 1069, 1272.

The ALJ next observed, consistent with SSR 16-3p, 2016 WL 1119029, at *5, that "a common side effect of prolonged and/or chronic pervasive pain is diffuse muscular atrophy." R. 44. Yet, Plaintiff displayed no evidence of muscle atrophy and exhibited normal 5/5 strength on physical examination. *Id.* (citing R. 770). Similarly, the ALJ observed there was no evidence of the "frequent" falls that Plaintiff testified that she suffered. Finally, the ALJ noted that Plaintiff was attending school to become a medical assistant in February 2012, and was looking for work as an MA in September 2012, more than three years after her alleged onset date. She reported at that time

that she could "stand no more than 5 hours," which was far longer than the 15 minutes she said she could stand in support of her application for disability benefits. Although the school activity and work search did not constitute disqualifying substantial gainful employment, the ALJ noted that they did "indicate that claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported." R. 44. As the Commissioner observes, while this evidence is not conclusive, it is not unreasonable to conclude that someone who had the kind of severe and disabling pain that Plaintiff claims would likely follow the advice of their doctors and would be unlikely to invest her time and money in a program to obtain a job she was incapable of performing. ECF No. 19 at 9–10.

The ALJ discounted the severity of symptoms Plaintiff attributed to her mental impairments for similar reasons. He noted that she reported to her health care provider in November 2014 that there was no psychiatrist in the city who would see her and, yet, despite the severity of the symptoms she alleged, she was unwilling to leave the city to see anyone. R. 43. In addition, the ALJ relied upon the consultative psychological evaluation performed by Steven Krawiec, Ph.D., in April 2013, as well as the opinions of state agency consultants Jack Spear, Ph.D, and Darrell Snyder, Ph.D., who had reviewed the file. The ALJ noted that according to Dr. Krawiec, and despite her alleged limitations, Plaintiff remembered 3/3 items immediately and after 4 minutes; she did well on serial 2s; her fund of information was intact; and her attention and concentration were sufficient to participate in ongoing conversation. R. 45. She also exhibited no problems with bilateral fine finger manipulation and dexterity, despite her testimony to the contrary. *Id.* Dr. Krawiec diagnosed major depression, panic disorder with agoraphobia, and attention deficit disorder not otherwise specified, and assessed a global assessment of functioning (GAF) score of 53, indicating only some symptoms

15

or difficulty functioning. *Id*. Based on his examination, from a psychological standpoint, Dr. Krawiec opined that Plaintiff had the cognitive capacity to understand and carry out simple job instructions and that she would not have difficulty getting along with co-workers or supervisors. He also opined, however, that her depression "could interfere with her energy which could interfere with persistence and pace; if anxiety were to occur at work, it would interfere with her ability to focus and carry out responsibility." R. 45. He thus concluded that significant workplace changes and stressors would be inadvisable. *Id.* Dr. Spear opined that Plaintiff "appears able to understand/remember/carry out instructions but may have some difficulty maintaining attention/concentration/persistence/pace" and with increased levels of stress and changes. R. 92. Dr. Snyder concluded that Plaintiff was capable of routine, repetitive tasks of 1-2 steps, and she could tolerate the stress of a predictable, routine, repetitive work setting. They also found no limitations to Plaintiff's ability to cope with co-workers or the public. R. 45–46 (citing R. 97,112).

The ALJ placed little weight on Plaintiff's testimony and statements concerning her daily activities and offered two reasons for doing so. First, the ALJ noted "daily activities cannot be objectively verified with any reasonable degree of certainty." *Id.* Second, he explained that even if Plaintiff's daily activities were as limited as alleged, "it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, including secondary gain, in view of the relatively weak objective medical evidence and the other factors discussed in this decision." *Id.* Neither reason is unsound. Rare is the disability claimant who admits to engaging in daily activities that belie his or her claim that he or she is unable to hold a job, and the sheer volume of claims and non-adversarial nature of the proceedings to determine disability preclude any opportunity for independent investigation. The simple fact is that in the absence of objective

evidence of a claimant's physical incapacity, there is no easy way to distinguish between what a person is unable to do and what a person simply does not feel like doing. Even doctors cannot see into a person's mind.

The ALJ also placed little weight on Plaintiff's claim that she could only sleep four hours a night, noting that her poor sleep at night was at least as likely due to her napping three hours during the day. Finally, the ALJ discounted the reports from Plaintiff's family and friends for much the same reason he gave little weight to Plaintiff's own statements. He noted that all were close to Plaintiff and naturally wanted to help her in her goal of obtaining benefits. In addition, the ALJ noted that their accounts were essentially repeats of Plaintiff's own subjective complaints which he found suspect for the reasons set forth.

Plaintiff's challenge to the ALJ's credibility determination takes the form principally of arguing that none of the evidence cited by the ALJ proves that she overstated her symptoms and retains the capacity to work. Each cited item of evidence can be viewed differently. For example, she suggests that the ALJ erred in considering her enrollment in school to become a MA and seeking employment as evidence that she could do more than she claimed since "persisting in looking for employment even while claiming to suffer from a painful disability might simply indicate a strong work ethic or overly-simplistic outlook rather than an exaggerated condition." ECF No. 14 at 22. Plaintiff also argues that the ALJ erred in interpreting her crying at medical appointments and unwillingness to leave the city to see a psychiatrist as evidence of exaggeration, since they could also be evidence of severe and incapacitating physical pain and mental illness. She argues that her inconsistency in taking medications could also be a result of her incapacity or due to the side effects or ineffectiveness of the medications. *Id.* at 18–19. Essentially, Plaintiff insists that because her

doctors did not write in their notes that she was exaggerating her symptoms, the ALJ was precluded from doing so. But the fact that her doctors accepted her complaints at face value is not surprising and beside the point. It was their job to treat her based on the history and complaints she provided them; it was the ALJ's job to determine whether she was as incapacitated as she claimed based on the entire record.

The fact that reasonable factfinders could draw different inferences from the same evidence is not a reason to overturn the ALJ's credibility determination; it does not make it patently wrong. There is no presumption that the statements of claimants seeking disability benefits are true absent conclusive evidence that they are exaggerating their symptoms. It would be a strange (and likely insolvent) system that required that applicants be awarded such valuable benefits whenever an ALJ in a non-adversary proceeding was unable to conclusively refute their subjective complaints of pain and disability. It is the province of the factfinder to weigh the evidence and draw reasonable inferences therefrom. "[S]ubstantial evidence is evidence which a reasonable mind would accept as adequate to support a conclusion, such that where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision rests with the Commissioner." *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001). Because the ALJ followed the correct procedure and it is not patently wrong, his credibility assessment will not be disturbed.

## B. Evaluation of Medical Opinion Evidence

Plaintiff also argues that the ALJ erred in failing to properly evaluate the opinions of Dr. VanDorp, her treating physician, Dr. Krawiec, the consulting psychologist who examined her, and Drs. Khorshidi and Chan, state agency consultants who reviewed the record. She contends that the

ALJ erred in failing to give Dr. VanDorp's opinions controlling weight or, alternatively, in failing to apply the relevant factors to determine the weight it otherwise deserved. She argues that contrary to his statement that he was giving significant weight to Dr. Krawiec's opinion, the ALJ ignored the limitations Dr. Krawiec identified. As to the opinions of Drs. Khorshidi and Chan, Plaintiff argues that the ALJ failed to apply the Commissioner's standards for assessing medical opinions and failed to take into consideration disciplinary actions taken against Dr. Khorshidi.

Under the regulations that were in effect at the time of the hearing, the ALJ was required to give "controlling weight" to the medical opinion of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R. § 416.927(c)(2); SSR 96–2p; *see also Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). The reason for the rule is that a claimant's treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). On the other hand, a treating physician can be subject to certain biases that are less likely to bear on other medical sources. *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability." *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir.1985). In addition, "the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the

advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. Still, when the opinion of a treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence, it is controlling.

Even when not given controlling weight, a treating physician's opinion cannot be simply ignored. "If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The same or similar factors are used to assess other medical opinions offered in the case.

Dr. VanDorp signed return to work forms in February, March, and August of 2012, in which he authorized Plaintiff's return to light work but with the following permanent restrictions: a 20-pound maximum lifting limitation; a 10-pound limitation for frequent lifting; 5 hours of work per day; no prolonged sitting or standing; and allowance for frequent position changes. R. 752. Plaintiff contends that given the length of time Dr. VanDorp has been seeing and treating her for her conditions, the ALJ was required to accept his opinion that she was able to work only 5 hours per day as controlling. She contends that Dr. VanDorp's opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence. And because a person who cannot work 8 hours a day for 5 days a week does not meet the minimal requirement of having an RFC to perform sustained work-related physical and mental activities in a work setting on a regular and continuing basis, a finding of disabled was required.

There is no doubt that the ALJ considered the opinions expressed by Dr. VanDorp. He explicitly recounted that he had reviewed "the various statements from Dr. VanDorp, MD (Exhibit

6F, 12F)," noting that Dr. VanDorp "stated that claimant has work restrictions of light duty, no more than 4 or 5 hours of work a day, frequent position changes, and no prolonged sitting." R. 46. The ALJ agreed that Plaintiff could meet the lifting requirements for light work, but rejected the other limitations Dr. VanDorp placed on Plaintiff, including the limitation of only 5 hours of work per day. In doing so, the ALJ explained that Dr. VanDorp "apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." *Id.* Because as he explained elsewhere in his decision, the ALJ found good reasons to question the reliability of Plaintiff's subjective complaints, he did not credit the opinion that appeared to have been based entirely upon them.

Plaintiff argues that the ALJ's finding is "legally wrong and unsupported by substantial evidence." ECF No. 14 at 11. She claims that the ALJ applied none of the applicable standards in his evaluation of Dr. VanDorp's opinion that she could only work 5 hours a day and accuses the ALJ of rejecting Dr. VanDorp's opinion on nothing more than a "hunch" that it was based only on her subjective complaints. She then recounts her treatment history with Dr. VanDorp, (the same history that the ALJ recounted, albeit in less detail), in an effort to show that Dr. VanDorp's opinion that she could only work 5 hours a day was not based solely on her subjective complaints. *Compare* ECF No. 14 at 11–13, *with* R. 42–43. None of the evidence cited by Plaintiff, however, refutes the ALJ's determination that the extreme limitations Dr. VanDorp placed on Plaintiff were based upon her subjective complaints and found no support in the medical evidence she referenced. Nowhere in his reports does Dr. VanDorp explain how he arrived at his opinion that she could work no more than 5 hours a day. It thus follows that if, as I have already determined, the ALJ's credibility assessment is not patently wrong, then his assessment of Dr. VanDorp's opinion is not in error. Dr. VanDorp's

opinion that Plaintiff could work only 5 hours a day was not well-supported by medically acceptable clinical and laboratory diagnostic techniques and it was inconsistent with other substantial evidence, including the opinions of the state agency consultants who reviewed the record and the September 2011 functional capacity evaluation.

Plaintiff also argues that the ALJ erred in failing to evaluate and weigh Dr. VanDorp's opinion using the factors set forth in 20 C.F.R. § 404.1527(c), including the nature and length of the treatment relationship, the source's specialization, supportability, consistency with the record, and other factors such as the source's knowledge of the SSA's disability programs. ECF No. 21 at 2. In support of her argument, however, she points to one paragraph of the ALJ's 18-page decision. *Id.* A full reading of the decision reveals that the ALJ extensively referenced Dr. VanDorp's treatment dating back to 2007 when he first saw her after she reported neck and back pain resulting from a slip and fall in an icy parking lot at work. R. 21, 418. Plaintiff participated in rounds of physical therapy as well as SI joint injections to relieve the pain, and by late 2007, Dr. VanDorp concluded her low back had improved to about 80% and no longer required further treatment. R. 418. Plaintiff did not again seek treatment from Dr. VanDorp until October 2011 when she complained about ongoing neck and low back pain. R. 533. The ALJ's analysis as a whole, including the repeated citations to Dr. VanDorp's treatment records, shows that he considered the nature and length of the treatment relationship and the supportability and consistency of the record. To the extent Plaintiff, represented by competent counsel, failed to present evidence bearing on other factors such as the sources specialization or knowledge of disability programs, the ALJ can hardly be faulted for failing to specifically consider it. In any event, the ALJ fully explained his reason for rejecting Dr. VanDorp's opinion.

Plaintiff next claims that the ALJ erred in his evaluation of the opinion of Dr. Krawiec, the consulting psychologist who conducted a comprehensive psychological evaluation of Plaintiff in April 2013. Although the ALJ said he gave "significant weight" to the opinions of Dr. Krawiec (R. 45), Plaintiff claims he did not. She contends that the ALJ failed to include in her RFC limitations Dr. Krawiec clearly found. For example, Plaintiff argues that Dr. Krawiec said she could not work eight hours a day, five days a week, and that her mental impairments would limit her ability to persist in tasks and maintain adequate pace. ECF No. 14 at 14. Yet, he did not include those limitations in her RFC. She also complains that he did not properly account for stress and her inability to handle her own finances in the RFC. *Id.* at 14–15.

Plaintiff misreads Dr. Krawiec's report. Dr. Krawiec did not say that Plaintiff did not have the capacity to complete an eight-hour work day five days a week. Nor did he say that she was unable to persist in tasks and maintain adequate pace. He said that her depression was such that he believed "it could interfere with her ability to muster the energy and effort to get into and remain in the workplace and perform efficiently." R. 1016. Dr. Krawiec also believed that this would "relate to her ability to persist in tasks and maintain adequate work pace" and that "[h]eightened anxiety, if it were to occur in the workplace, could interfere with her ability to focus on and carry out work responsibilities." *Id.* "Such difficulties," Dr. Krawiec noted, "would also be affected by her attention difficulty." *Id.* To say that one's depression could interfere with her ability to work full-time or that it may affect her persistence or pace is not the same as saying that she lacks the capacity to work full-time and carry out work-related tasks. In fact, Dr. Krawiec explicitly opined that Plaintiff "has the cognitive capacity to understand and carry out simple job instructions." *Id.* While Dr. Krawiec stated Plaintiff "might . . . have difficulty being organized and staying on task," he never stated she

could not hold a job. To the contrary, his caution that "workplace changes and stressors would be inadvisable," *id.*, implies that he thought she could. Why offer such a suggestion if she cannot hold a job at all?

Ultimately, Plaintiff's argument is based on a misunderstanding of the concept of a claimant's RFC. A claimant's RFC is the most that the claimant can do despite her limitations. 20 C.F.R. § 404.1545(a). It is not the most she can do without difficulty. To say that a claimant might have difficulty performing work does not mean that she cannot perform it; just the opposite, it means she can perform it albeit with difficulty. Thus, a medical source's opinion that the claimant has certain impairments that might make it difficult to perform certain tasks or that might interfere in her ability to complete a work day is not the same as an opinion that she cannot do so. Dr. Krawiec did not say that Plaintiff could not perform work on a sustained basis, and the ALJ did not error in failing to include such a limitation in the RFC.

Plaintiff also contends that the ALJ failed to properly evaluate the opinions of Dr. Khorshidi and Dr. Chan, the two state agency consultants that reviewed Plaintiff's file to assess her physical RFC. Both concluded that Plaintiff was capable of light exertional work with no additional physical limitations. The ALJ concluded their opinions were entitled to great weight "as they are supported by the medical evidence of record and claimant's testimony regarding *his* daily activities." R. 47 (emphasis added). Plaintiff complains that in addition to getting the pronoun wrong, her testimony concerning her daily activities does not support the opinion that she is capable of light work. She also contends that the ALJ did not evaluate the State agency opinions using the Commissioner's standards and specifically failed to acknowledge and consider the fact that Dr. Khorshidi has been

disciplined and fined in two States for misrepresenting her specialty while engaged in government service.  ECF No. 14 at 25.

It is true that the ALJ referred to Plaintiff using the wrong pronoun and her testimony concerning her daily activities does not support the opinions offered by Drs. Khorshidi and Chan. Neither error requires reversal, however.  Plaintiff's complaint about pronoun usage is more a rhetorical device than a substantive argument and does not merit further discussion.  And the fact that Plaintiff's testimony concerning her daily activities does not support the opinions of Dr. Khorshidi and Dr. Chan does not matter since, as noted above, the ALJ placed little weight on Plaintiff's testimony concerning her daily activities.  The other reason the ALJ provided for giving their RFC opinions great weight—namely, because they were "reasonable and consistent with the objective medical evidence"—is sufficient.  True, the ALJ might also have noted the more generic reasons for crediting the State agency consultants' opinions such as the fact that they review the entire file and are experts in the Social Security disability programs.  *See* SSR 96-6p; 20 C.F.R. § 1527(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.").  In light of the ALJ's overall discussion of the medical evidence, however, any error in this regard was harmless. And since the extrinsic evidence concerning disciplinary actions against Dr. Khorshidi was not offered at the hearing, the ALJ did not error in failing to consider it.  In any event, it does not warrant reversal.

## C. Residual Functional Capacity Assessment

Plaintiff next claims that the ALJ erred in failing to fully inform the vocational expert (VE) of her mental limitations and restrictions. She notes that in completing the SSA mental RFC form, State agency consultants Jack Spear, Ph.D., and Darrel Snyder, Ph.D., indicated Plaintiff had moderate limitations in the following areas:

- Carry out detailed instructions;
- Maintain attention and concentration for extended periods;
- Perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- Complete a normal workday and workweek without interruptions from psychologically based symptoms; and
- Perform at a consistent pace without an unreasonable number and length of rest periods.

R. 97, 111. Yet the ALJ failed to include these limitations in the RFC and in the hypothetical question he posed to the VE. Plaintiff also notes that the ALJ found that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace at Step 3 of the sequential evaluation process and failed to include this finding as well. Citing *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014), and *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015), Plaintiff contends that by failing to inform the VE of these findings, the ALJ "violated the well-established law of this Circuit." ECF No. 14 at 26–27.

As noted above, a claimant's RFC is "the most [the claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545(a)(1). Where, as here, a case proceeds to a hearing, it is the responsibility of the ALJ, not the medical experts, to assess the claimant's RFC. *Id.* § 404.1546(c). Although the ALJ must consider opinions from medical sources in assessing issues such as a claimant's RFC, "the final responsibility for deciding these issues is reserved to the Commissioner." *Id.* § 404.1527(d)(2).

The SSA uses what it calls its "special technique" to evaluate the severity of mental impairments. *Id.* § 404.1520a. The special technique is intended to "(1) Identify the need for additional evidence to determine impairment severity; (2) Consider and evaluate functional consequences of the mental disorder(s) relevant to [the claimant's] ability to work; and (3) Organize and present [the SSA's] findings in a clear, concise, and consistent manner." *Id.* § 404.1520a(a). The regulations describe how it operates. The special technique requires first an evaluation of the claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). If a mental impairment is found, the SSA then rates the degree of functional limitation resulting from it in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3) and (4). These four functional areas comprise paragraph B criteria for the mental impairment listings. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders. The degree of limitation in the first three areas is rated on a five-point scale: none, mild, moderate, marked and extreme. The degree of limitation for episodes of decompensation is rated on a four-point numerical scale: none, one or two, three, four or more. *Id.* § 404.1527(c)(4). These ratings are then used to determine whether the mental impairment is severe (Step 2) and, if so, whether it meets the criteria of one of the listings for mental impairments (Step 3).

If a claimant has had no episodes of decompensation and the first three functional areas are rated none or mild, the SSA generally concludes that the claimant does not have a severe mental impairment. *Id.* § 404.1520a(d)(1). If any of the first three functional areas are rated moderate or above, or if the claimant had one or more episodes of decompensation, the mental impairment is considered severe and the SSA then determines whether it meets or is equivalent in severity to a

listed mental impairment. If a claimant's impairment meets or medically equals the criteria for one of the listed impairments, the individual is deemed disabled at Step 3 of the SSA's sequential evaluation process. *Id.* § 404.1520(d)(2). If, however, a mental impairment is severe, but does not meet or medically equal a listed impairment, then a more particularized assessment is made of the claimant's mental RFC. *Id.* § 404.1520a(d)(3).

To document the application of the special technique, the SSA has created an electronic form called the Psychiatric Review Technique (PRT), which is completed by the State agency medical or psychological consultant at the initial or reconsideration level of the administrative review process. 20 C.F.R. § 404.1520a(e)(1). At a hearing on the claim, the ALJ is required to incorporate the pertinent findings and conclusions on the PRT into his or her written decision. 20 C.F.R. § 404.1520a(e)(4). A second form, the Mental Residual Functional Capacity Assessment (MRFCA), is used to document the more detailed evaluation that is required when the claimant's mental impairment, though severe, does not meet or exceed the criteria of a listing and a mental RFC must be determined. The use of these forms is explained in the SSA's Program Operations Manual System (POMS), which is available at https://secure.ssa.gov/apps10/poms.nsf. *See* POMS DI 24505.025; DI 24510.060.

In this case, the ALJ properly applied the special technique in evaluating Plaintiff's mental impairments. He found that Plaintiff's mental impairments did not meet or medically equal the criteria of listings 12.04 and 12.06. Based on the entire record and in particular the reports of Drs. Spear and Snyder, the ALJ found for the paragraph B criteria that Plaintiff had moderate limitations in activities of daily living; mild difficulties in social functioning; moderate difficulties in concentration, persistence, or pace; and no episodes of decompensation. R. 39–40 (citing R. 93–94,

107–08). Although these findings did not meet the criteria for either of the listings considered, they did indicate that Plaintiff's mental impairments were severe and that a mental residual functional evaluation was needed. Consistent with SSR 96-8p which is entitled "Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims," the ALJ then noted:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments.

R. 40.

The ALJ returned to Drs. Spear and Snyder later on in his decision, referencing their more detailed MRFC forms, when he explained how he arrived at Plaintiff's RFC. R. 45. The MRFC assessment form lists a series of questions intended to "help determine the individual's ability to perform sustained work activities." R. 96, 111. The instructions note, however, that "the actual mental residual functional capacity assessment is recorded in the narrative discussion(s), which describes how the evidence supports each conclusion." *Id.* The discussion is to be "documented in the explanatory text boxes following each category of limitation (i.e., understanding and memory, sustained concentration and persistence, social interaction and adaptation)." Id. "Any other assessment information deemed appropriate may be recorded in the MRFC - Additional Explanation text box." *Id.*

As Plaintiff noted, in completing the MRFC, Drs. Spear and Snyder indicated for several of the functions listed that Plaintiff was "moderately limited." R. 96–97, 111–12. Neither concluded,

however, that Plaintiff was unable to carry out the listed functions. Dr. Snyder's narrative explanation of Plaintiff's mental RFC in the "Additional Explanation" section of the report reads:

> Clmt has problems with understanding and with memory of more complex information, and in carrying out complex tasks but the clmt's ability to sustain concentration and carry out routine, repetitive tasks of 1-2 steps would be intact.

> The clmt's ability to handle public contact and to cope with co-workers and supervisors would be adequate. The claimant's ability to adapt to changes in the work place would be adequate to tolerate the stress of a predictable, routine repetitive work setting within her physical tolerances.

R. 112. Based upon not just the reports of Drs. Spear and Snyder, but all of the evidence in the record, the ALJ found that Plaintiff had the RFC to perform a range of light work that was limited, due to her mental impairments, to "simple, routine, and repetitive tasks, performed in a work environment involving only simple, work related decisions, and with few, if any, work place changes." R. 40–41.

Plaintiff argues that the ALJ erred in failing to include in the RFC a limitation to tasks of one or two steps based on Dr. Snyder's narrative explanation. But Dr. Snyder did not say Plaintiff was capable of only performing one or two-step tasks, a limitation that, if taken literally, would even preclude brushing her teeth or taking a shower. He said her "ability to sustain concentration and carry out routine, repetitive tasks of 1-2 steps would be intact." R. 112. Moreover, it is the responsibility of the ALJ to assess a claimant's RFC. 20 C.F.R. § 404.1527(d)(2). Consistent with the other mental health consultants, the ALJ reasonably concluded that Plaintiff was capable of simple, routine and repetitive tasks.

Plaintiff next argues in effect that the ALJ was required to include in his RFC separate limitations corresponding to each of the functions listed in the MRFC as to which Drs. Spear and/or Snyder indicated Plaintiff had moderate limitations. ECF No. 14 at 26–27. But that is not the law.

*Varga* held that the ALJ "may rely on a doctor's narrative RFC, rather than checkboxes, where that narrative adequately encapsulates and translates those worksheet observations." 794 F.3d at 816 (citing *Johansen v. Barnhart*, 314 F.3d 283, 286 (7th Cir. 2002)). In *Varga*, the doctor's narrative explanation was missing. *Id.* And in *Yurt*, the court held that the narrative failed to accurately capture the claimant's documented difficulties. 758 F.3d at 859.

In this case, although the mental health consultants all thought that Plaintiff had some limitations, none of them said she lacked the capacity to perform the tasks needed for the RFC formulated by the ALJ. Dr. Krawiec opined that Plaintiff "has the cognitive capacity to understand and carry out simple job instructions." R. 1016. Dr. Spear noted in his narrative that Plaintiff "appears able to understand/remember/carry out instructions but may have some difficulty maintaining attention/concentration/persistence/pace, may be able to relate appropriately to others in workplace but may have difficulty w/ increased level of stress and changes." R. 97. Dr. Spear also noted Plaintiff's "attention and concentration intact, remote memory and fund of know[ledge] good, variable math calcs. abstract thought intact, insight and judgment adequate, can be somewhat of a procrastinator but manages independent ADL/personal care functions well." *Id.* And Dr. Snyder found that Plaintiff's "ability to sustain concentration and carry out routine, repetitive tasks of 1-2 steps would be intact." R. 112. The RFC determined by the ALJ encapsulated the limitations the consultants identified.

To repeat, the RFC is the most the claimant can do despite her limitations and it is the ALJ's responsibility to determine a claimant's RFC. 20 C.F.R. § 404.1545(a), § 404.1527(d)(2). To say that a claimant "may have difficulties" performing a function is not the same as saying she cannot perform it. This is especially true when one considers what the term "moderate" is intended to mean

in this context. The recent rule revisions by the SSA clarify that a "moderate" limitation means that a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." SSA, Revised Medical Criteria for Evaluating Mental Disorders, 81 Fed. Reg. 66138, 66164 (Sept. 26, 2016) (effective January 17, 2017). Although the revised regulations became effective after the hearing was held in this case, the definitions "are consistent with how [SSA's] adjudicators have understood and used those words in [SSA's] program since [SSA] first introduced the rating scale in 1985." 81 Fed. Reg. 66147. As a result, the definitions set forth in the new rules "do not represent a departure from prior policy." *Id.* This clarification, which was not before the Court in either *Varga* or *Yurt*, provides the clarity I found missing in *Pingel v. Colvin*, 156 F. Supp. 3d 947, 957–58 (E.D. Wis. 2016), needed to assess whether the ALJ had properly translated moderate limitations noted by the consultant into the RFC. Given this understanding of the term "moderate," the ALJ's RFC and corresponding hypothetical question put to the VE adequately captured the limitations he found from the evidence. If Plaintiff's ability to function within the limitations stated by the ALJ on a sustained basis was "fair," it was not unreasonable for the ALJ to conclude she was not so incapacitated that she could not hold any job.

## D. Vocational Expert and Dictionary of Occupational Titles

Plaintiff also challenges the qualifications of the VE who testified at the hearing and the VE's reliance on the Dictionary of Occupational Titles (DOT). The VE testified that Plaintiff was incapable, given the RFC set out in the ALJ's hypothetical question, to perform any of her past jobs, such as a Policyholder Information Clerk, Insurance Agent, and Receptionist. R. 79–80. The VE identified several jobs listed in the DOT that she could perform, however. These included company Mail Clerk, Ticket Taker, and Retail Sales Attendant. Based on the U.S. Department of Labor's

Bureau of Labor Statistics most recent report, the VE testified there existed approximately 51,000 Mail Clerk, 53,000 Ticket Taker, and 2.2 million Retail Sales Attendant jobs in the U.S. workforce. R. 80. Based upon this testimony, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

Prior to the hearing, Plaintiff's attorneys filed a set of standing objections to the VE's qualifications and basis for offering any testimony concerning the availability of jobs within the locality, region or nation. R. 300. Plaintiff's counsel also requested issuance of a subpoena before the hearing directing the VE to bring with him to the hearing all statistical sources he may rely upon in forming his opinions or, alternatively, directing the VE to provide counsel with a list of the sources that may be used to form his opinions regarding job numbers in the local, regional, and national economy. R. 298–99. Exercising the discretion afforded him under the regulations, the ALJ denied counsel's request, noting that counsel had failed to comply with 20 C.F.R. § 404.950(d)(2) by stating "the important facts the witness or document is expected to prove; and indicate why these facts could not be proven without issuing a subpoena." R. 34. In response to counsel's assertion that the number of jobs that exist in various labor markets for a variety of obligations cannot be proven without the issuance of the subpoena, the ALJ noted that the SSA takes Administrative Notice of reliable job information from various governmental and other publications. *Id.* (citing 20 C.F.R. § 404.1566(d)).

The ALJ did not err in denying counsel's request. Since this information is publicly available and was as accessible to counsel as it was to the VE, the ALJ's ruling is reasonable. As the Commissioner suggests, counsel's effort to transform what is intended to be a non-adversarial informal proceeding into "a *Daubert*-style investigation into vocational evidence" would overwhelm

an agency already struggling to adjudicate the millions of applications for disability benefits. ECF No. 19 at 15. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). It would also substantially increase the already huge costs of administering the program.

Plaintiff's argument that the VE was not qualified also fails. She argues that the VE was not qualified because most of his work has been testifying as an expert, making him nothing more than a professional witness. ECF No. 14 at 28. But that is not true. The VE's resume shows that he is a licensed professional counselor, has a MS from the University of Wisconsin at Stout with Vocational Rehabilitation listed as the major subject. In addition, the resume shows a long career in vocational rehabilitation, including more than ten years as a rehabilitation counselor, twelve years as the Assistant District Director and three years as the District Director for the Wisconsin Division of Vocational Rehabilitation. R. 137. His education and experience are more than sufficient to qualify him as a VE.

Lastly, Plaintiff's challenge to the reliance by the VE and the ALJ on the DOT finds support in *Dimmitt v. Colvin*, 816 F.3d 486, 488–90 (7th Cir. 2016). There, the Court sharply criticized the SSA for failing to endorse O*NET, which it described as "the most current manual of job descriptions," despite its awareness of "the obsolescence of the Dictionary of Occupational Titles." *Id.* at 489. But the Court did not hold that it was *per se* error to rely on the DOT. Given the fact that the DOT remains the first in the list of publications of job data of which the SSA has taken administrative notice, 20 C.F.R. § 404.1566(d)(1), this is not surprising. Holding that use of the DOT constitutes *per se* error would call into question all of the SSA adjudications in which the DOT plays a role. It would also run afoul of the rule requiring judicial deference "to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of

deference to administrative interpretations." *Chevron v. Natural Res. Defense Council, Inc.*, 467 U.S. 837, 844 (1984); *Astrue v. Capato*, 566 U.S. 541, 558 (2012) ("*Chevron* deference is appropriate when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.") (internal quotation omitted). While O*NET may be a better source of job data than the DOT, it is hard to see why reliance on the DOT could be considered error in light of the SSA regulations. The number of positions identified by the VE, even if not all fall within Plaintiff's RFC, are more than sufficient to constitute substantial evidence of jobs Plaintiff is capable of performing, given her RFC.

## CONCLUSION

The ALJ followed the rules and regulations governing the adjudication of disability claims and provided a logical bridge from the evidence to his conclusion. His decision is supported by substantial evidence, defined as "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf*, 602 F.3d at 874. The fact that other ALJs or judges might draw different inferences that lead to a different conclusion is not a reason for reversal. Accordingly, the decision of the Commissioner is affirmed. The Clerk is directed to enter judgment accordingly.

Dated this __18th__ day of September, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

35